Reinhold FEIL and Kathryn Feil,
Plaintiffs and Respondents,

v.

Max A. WISHEK, Defendant
and Appellant.

Civ. No. 8750.

Supreme Court of North Dakota.

Dec. 16, 1971.

Rehearing Denied Feb. 8, 1972.

Hjellum, Weiss, Nerison, Jukkala & Vinje, Jamestown, for defendant and appellant.

Gerald G. Glaser, Bismarck, for plaintiffs and respondents.

ERICKSTAD, Judge.

The defendant Max A. Wishek appeals from a judgment entered on March 16, 1971, in favor of the plaintiffs Reinhold Feil and Kathryn Feil in the District Court for the County of McIntosh. The judgment awards the Feils the sum of $6,083.22, which includes costs and interest. Wishek demands a trial de novo in this court.

■ Although the Feils did not raise this issue in their brief, at the time of the oral argument they contended that a demand for trial de novo was not properly made.

This argument is a highly technical one. The record on appeal discloses that attached to the inside cover of the transcript is a demand for trial de novo dated the 8th of June 1971, signed by counsel for the defendant. The record also contains an affidavit of service by mail, disclosing that counsel for the plaintiffs was served a copy of the transcript, demand for trial de novo, and a brief, as of August 31, 1971.

The trial judge has signed two certificates in this case. The first certificate is dated June 11, 1971, and is entitled "Judge's Certificate Identifying Exhibits and Settling and Allowing the Statement of the Case". That certificate includes a statement that the attached transcript is a true and correct transcript of the testimony. The original transcript in this case has attached to it the demand for trial de novo hereinbefore referred to.

The second certificate signed by the trial judge is dated August 31, 1971, and is entitled "Certificate of Judge of District Court Re Judgment Roll and Record on Appeal". That certificate asserts, "[T]hat there is hereto attached the records and files constituting the judgment roll and record on appeal . . . to wit:"; thereafter 29 items are described. Items 27 and 28 read:

"27. Transcript of Proceedings & Demand for Trial De Novo and Review of Entire Case.

"28. Affidavit of Service by Mail upon Gerald G. Glaser of Transcript, Demand for Trial De Novo & Review of Entire Case, and Brief of Defendant-Appellant."

The Feils do not deny that they received a copy of the transcript, nor do they assert that their copy of the transcript failed to contain a demand for trial de novo. Accordingly, we think that the argument that the case is not before us de novo is without merit.

On June 19, 1965, Mr. Wishek prepared an agreement wherein the Feils agreed to sell the furniture and fixtures and stock of merchandise of their grocery store, and Calvin Mayer agreed to buy the same.

This case arises out of a claim on the part of the Feils that because Mr. Wishek as their attorney failed to advise them to file the agreement with the register of deeds of their county upon its execution, and as a result it was filed too late to constitute a lien, they were treated as general creditors of Mr. Mayer in his bankruptcy proceedings, when, had they been properly advised, they would have properly filed their agreement and then would have been preferred creditors.

The trial court concluded that the agreement was in substance a conditional sales contract. With this conclusion even Mr. Wishek seems to agree. He can hardly disagree, for if it does not qualify as a security agreement reserving title to the furniture and fixtures in the sellers until full payment is made, Mr. Wishek has prepared a defective instrument. The preparation of an instrument so defective as not to qualify for filing as a security agreement could in itself be considered malpractice.

Under our law as it existed at the time of the preparation and execution of the agreement, the vendors in a conditional sales contract were protected from the vendee's creditors only if the agreement reserving title in the personal property was in writing and only if filed in the same manner as a mortgage of personal property. Sec. 51–07–10, N.D.C.C.

The pertinent part of our statute providing for the filing of a chattel mortgage as of the date of the preparation and execution of the agreement reads:

"35–04–06. Mortgage void as to creditors unless filed—Chattel mortgage on motor vehicle must be shown on certificate of title.—Mortgage of personal property is void as against creditors of the mortgagor and subsequent purchasers and encumbrancers of the property in good faith for value, unless the original or an authenticated copy thereof is filed by depositing it in the office of the register of deeds of the county where the property mortgaged, or any part thereof, is situated at the time of filing.

\*   \*   \*   \*   \*   \*

Although the agreement was signed on June 19, 1965, by the parties, it was not filed in the register of deeds' office of McIntosh County until March 7, 1968, when Mr. Feil, by a long-distance telephone call from Colorado, requested Mr. Wishek to do so.

On April 4, 1968, Calvin Mayer filed a petition in bankruptcy.

On May 17, 1968, Mr. Wishek filed with the bankruptcy court a claim of ownership for the Feils, a copy of the agreement, a payment schedule, and proof of statement of claim. Hearing was held on July 12, 1968.

The referee in bankruptcy, by order dated April 8, 1969, held that, "[T]he failure to file the conditional sales agreement until less than a month before the petition in bankruptcy was filed was a preference under Section 60 of the Bankruptcy Act". He

concluded that the late filing constituted a preference and was thus void against the trustee and that therefore the Feils were merely unsecured creditors. The decision of the referee, relying upon Glessner v. Massey-Ferguson, Inc., 9 Cir., 353 F.2d 986 (1966), is not disputed by the parties in this case. We accept it as the law of this case.

It is agreed that the document entitled "Plaintiff's Exhibit No. 1", otherwise described by the trial court as a conditional sales contract, was prepared under Mr. Wishek's direction in his law office in Ashley, North Dakota, on June 19, 1965. It was signed by Reinhold Feil and Calvin Mayer on the same date, before Mr. Wishek as notary public, and before two witnesses, namely Gust Mayer and Calford Mayer, the latter-named person being Mr. Wishek's secretary.

Pertinent parts of the agreement follow:

### "AGREEMENT

"This agreement made and entered into this 19th day of June, 1965, by and between Reinhold Feil and Kathryn Feil, husband and wife, Ashley, North Dakota, parties of the first part, and Calvin Mayer, of Jamestown, North Dakota, party of the second part;

"Witnesseth: It is hereby contracted and agreed that the parties of the first part agree to sell and transfer to the party of the second part all of the furniture and fixtures of Reinie's Red Owl agency located in the City of Ashley, North Dakota, as set out on the attached list, for the sum of $27,000.00, payable as follows:

"$2,000.00 cash at the time of the execution of this agreement,

"$2,500.00 due and payable September 1, 1965,

"$2,500.00 due and payable January 2, 1966, and the balance of $20,000.00 payable in amortized monthly installments with interest at six per cent per

annum to be fully paid by January 2, 1976, which payments are to be set up in a schedule and attached to and made a part of this contract.

"Second party reserves the privilege of making additional payments or paying the entire balance at any time prior to the due date with interest computed only to the date of payment, after 5 years.

"First parties do further hereby sell unto second party all groceries in said store for the retail price thereof, less 16 per cent, with the exception of all supplies. Produce items are to be listed separately and priced at cost. Fresh meats are to be listed separately and priced at cost. Second party shall pay cash for said merchandise and supplies. The inventory of said merchandise shall be taken on July 5, 1965.

"It is further agreed that upon completion of this agreement first parties will execute to second party a bill of sale with clear title covering all of the furniture and fixtures herein described and sold.

"First parties further agree to fully comply with the North Dakota bulk sales law.

\*    \*    \*    \*    \*    \*

The original and two copies of the agreement were signed at that time and when Reinhold Feil and Calvin Mayer left the law office, one had the original and the other had an executed copy in his possession. The other executed copy was retained in the law office.

The parties never again returned to the law office together.

The $2000 cash payment called for in the agreement was made in the plaintiff's store later that same day; the amortization schedule called for in the agreement was not returned to the law office, but was delivered by Mr. Feil to Mr. Calvin Mayer directly.

It was understood at the time the parties left the law office on the day of the signing of the agreement that an old mortgage, which contained a list of the furniture and fixtures, could be used as an aid in preparing the list of furniture and fixtures to be attached to the agreement. This mortgage was referred to while the parties were in the attorney's office on the 19th of June, but was admittedly incomplete, inasmuch as there had been some changes made in the property from the date of the mortgage to the date of the execution of the agreement.

Mr. Feil contends that he delivered the chattel mortgage to Calford Mayer, Mr. Wishek's secretary in the law office, about a month after the date of the execution of the agreement. At no time did he deliver to Mr. Wishek or his secretary a supplementary list covering new items acquired subsequent to the date of the mortgage.

Although it is conceded by the Feils that they had creditors at the time of the execution of the agreement, they at no time supplied either the purchaser or the lawyer with a list of the creditors so that proper notices could be sent to the creditors pursuant to the Bulk Sales Law then in effect. They assert that they did not provide the list of creditors for the reason that they did not know that they were required to do so to comply with the Bulk Sales Law and that they had not been requested to do so by Mr. Wishek.

Mr. Feil testified that he talked to Mr. Wishek in his law office on August 23, 1965, at the time that Mr. Wishek handled the sale of their home in Ashley. According to Mr. Feil, he asked Mr. Wishek at that time if everything had been taken care of in connection with the agreement between Mr. Mayer and himself, and that Mr. Wishek said, "Everything was taken care of."

Mr. Feil also testified that Mr. Wishek made a similar statement in his office on October 18, 1965, when Mr. Feil paid him for services rendered.

Mr. Feil further testified that he became concerned in 1968 when Mr. Calvin Mayer fell a little behind on his payments and at that time he wrote to the register of deeds at Ashley to determine whether the agreement was recorded in the register of deeds' office. When he received a letter from the register of deeds to the effect that the contract was not filed in that office, Mr. Feil said that he tried to call Mr. Wishek at his home and was told he was not there. The following morning he called Mr. Wishek's office and learned he was in California.

On March 7, 1968, Mr. Feil was able to contact Mr. Wishek by telephone from Fort Collins, Colorado. His testimony with respect to that telephone conversation follows:

"A I asked him how the store was doing over there and how everything was doing.

"Q All right.

"A He told me that he had been trying to call me to tell me that he had heard that the store was going to close, and it wasn't going to open any more.

"Q All right.

"A And I asked him, 'Are we protected, and is everything in order?' And he said, 'Yes.'

"Q And was there anything discussed at that time about recording this contract?

"A Right; yes.

"Q What happened; what was discussed in that conversation?

"A I asked him, 'Are you sure nothing has to be recorded?' He said, 'No, you are taken care of; everything is all right.' "

Mr. Feil returned to North Dakota shortly after the telephone conversation and on checking with the register of deeds found that Mr. Wishek had filed a copy of the agreement at 1:10 o'clock p. m., March 7, 1968.

Mr. Wishek denied the conversations testified to by Mr. Feil. Parts of his testimony follow:

"Q And did you ever make the statement on August the 23rd, 1965, or any other time 'that everything was taken care of' to Mr. Feil?

"A Well, I am positive that I didn't, because I couldn't have made a statement of that kind in view of the fact that there never had been an agreement on the items that Mr. Mayer was buying.

"Q Well, did you feel that it was proper for you to file this instrument in view of the fact that you were representing Mr. Mayer also in this matter?

"A Well, I knew that Mr. Mayer was in trouble, and Mr. Feil had asked me to take it up there and file it.

"Q Do you recall of Mr. Feil being in your office on October the 15th and paying you for your services?

"A No, I don't.

"Q And do you recall at any time his asking you if—strike that. Do you recall at any time talking to him and telling him everything was taken care of and filed?

"A I am positive I never said anything of that kind. It is possible that he might have talked to Mr. Viker. I had no reason to talk to him and tell him everything was taken care of and filed.

"Q Who is Mr. Viker?

"A Mr. Viker was a partner of mine and was in my law office at the time.

"Q I don't know if I have asked you this question or not; so I will just ask you. In the telephone conversation on March the 7th, 1968, did you tell Mr. Feil

at that time that everything was in order and that he was protected?

"A I am sure that I did not have an occasion to make such a statement. Also, I was telling him at the time that the contract was not complete and wasn't ready for filing. That was just a misstatement of my statement. I made no such statement.

\* \* \* \* \* \*

"Q All right. Did you ever tell him that there was no need to have this agreement on record?

"A Never.

"Q Now, I believe that you said when they didn't come back in, you finally billed them in October of 1965?

"A October the 15th.

"Q Do you know whether or not Mr. Mayer ever came back in your office?

"A He didn't come in to discuss this deal, but he was in the office on other business.

"Q But this matter was never discussed?

"A No, sir.

"Q And when you say that, of course, you are talking about in your presence?

"A In my presence."

Mr. Wishek's secretary testified, in part, as follows:

"Q And was there a list of the property delivered to you by Mr. Feil?

"A Yes.

"Q And he has testified that he delivered this to you on July the 19th, 1965; is that correct?

"A No.

"Q Were you in Ashley on that date?

"A No.

"Q Where were you?

"A On that date, I was in Nevada on a trip to California.

"Q But in any event, he did give you a list?

"A Yes."

During the trial Mr. Calford Mayer produced a gasoline sales slip showing he was in the State of Nevada on the date that Mr. Feil states that he delivered the mortgage to him at the law office. It is admitted, however, by Calford that the mortgage was left with him at the law office either before the 17th of July 1968, when he left on a trip to California, or after the 30th of July, when he returned, and that he placed it in the office file.

The trial court awarded judgment to the Feils on the ground that Mr. Wishek failed to advise them that the agreement should be filed in the office of the register of deeds of that county in order to protect them from claims of creditors of Calvin Mayer.

Mr. Wishek contends that any such advice would have been premature and that he was relying on the parties to keep their part of the agreement, which was, according to him, to return to the law office for the purpose of agreeing to the list of furniture and fixtures to be attached to the agreement, to attach the amortization schedule to the agreement, and to comply with the Bulk Sales Law.

The Feils assert that Mr. Wishek did not inform them of the effect or necessity of filing the agreement and that they did not fail to perform any act which they were advised to perform.

Mr. Wishek contends that when the parties did not return to his office to carry out the terms of the agreement, he assumed that they were either satisfied with it as it was or that they had gone to some other law office for advice, and that he then billed them for the services he had rendered.

Under this state of the record, we must determine first of all whether Mr. Wishek was negligent in concededly failing to advise the Feils that the agreement should be filed in the register of deeds' office to protect them from the claims of Mr. Mayer's creditors. We conclude that he was negligent in failing to so advise them. He may also have been negligent in other respects which we believe it unnecessary to discuss at this time.

■ Although the negligence alleged in the instant case involves the failure to properly advise a person in connection with the filing of a security agreement prepared by an attorney, we think the law stated relative to an attorney's liability for negligence in the preparation of a defective mortgage in an early New Jersey decision establishes the standard we must apply in this case.

" . . . A lawyer, without express agreement, is not an insurer. He is not a guarantor of the soundness of his opinions, or the successful outcome of the litigation which he is employed to conduct, or that the instruments he will draft will be held valid by the court of last resort. He is not answerable for an error of judgment in the conduct of a case or for every mistake which may occur in practice. He does, however, undertake in the practice of his profession of the law that he is possessed of that reasonable knowledge and skill ordinarily possessed by other members of his profession. He contracts to use the resonable knowledge and skill in the transaction of business which lawyers of ordinary ability, and skill possess and exercise. On the one hand, he is not to be held accountable for the consequences of every act which may be held to be an error by a court. On the other hand, he is not immune from responsibility, if he fails to employ in the work he undertakes that reasonable knowledge and skill exercised by lawyers of ordinary ability and skill. The duties and liabilities between an attorney and his client are the same as those between a physician and his patient. Both the attorney and physician are required to exercise that reasonable knowledge and skill ordinarily possessed and exercised by others in their respective professions." McCullough v. Sullivan, 102 N.J.L. 381, 384, 132 A. 102, 103, 43 A.L.R. 928, 930 (1926).

This rule was quoted with approval by the supreme court of Arizona in 1962, in Mageary v. Hoyt, 91 Ariz. 41, 369 P.2d 662 at 665.

More recently, the supreme court of Washington quoted with approval the standard set forth in the Restatement of Torts:

"The Restatement (Second) of Torts, § 229A (1965), states the standard as follows:

"Unless he represents that he has greater or less skill or knowledge, one who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities.

"Prosser explains that:

"Professional men in general, and those who undertake any work calling for special skill, are required not only to exercise reasonable care in what they do, but also to possess a *standard minimum of special knowledge and ability*. . . . Torts (3d ed. 1964) § 32, p. 164." Cook, Flanagan & Berst v. Clausing, 73 Wash.2d 393, 438 P.2d 865, 866 (1968).

The Washington court went on to hold that the correct standard to which an attorney is held in the performance of his professional services is that degree of care, skill, diligence and knowledge commonly possessed and exercised by a reasonable,

careful and prudent lawyer in the practice of law in that State. Cook, Flanagan & Berst v. Clausing, *supra*, 438 P.2d 865, at 867.

■ We agree with the trial court that Mr. Wishek, the attorney in the instant case, failed to exercise that degree of care commonly possessed and exercised by other reasonable, careful and prudent lawyers of this State, in not advising his clients that the agreement should be filed in the appropriate office.

In a California district court of appeals decision relied upon by the trial court in the instant case, that court said:

"The courts have consistently held that liability will be imposed for a want of such skill, prudence and diligence as lawyers of ordinary skill and capacity commonly possess and exercise." Theobald v. Byers, 193 Cal.App.2d 147, 13 Cal.Rptr. 864, 865, 866, 87 A.L.R.2d 986 (1961).

The facts in that case, as stated by the appellate court, follow:

"The record shows that the defendants are attorneys practicing in Gilroy, California, Jacobs being the employee of Byers. On September 5, 1956, plaintiffs employed defendants to prepare a note and chattel mortgage in connection with a loan of $5,000 which plaintiffs were making to John Higgins and Charles Fette, who were engaged in the food canning business, and for whom the defendants did all of their legal work. Aureguy spoke to Jacobs about the drawing of the documents and told him what was involved and arranged with Jacobs to deliver them to Higgins when he had completed their preparation. Higgins received the documents from the secretary of Byers and Jacobs without any directions as to the acknowledgment or recordation of the chattel mortgage, although Jacobs was present in the office at the time Higgins appeared and received the papers. The result was that Higgins and Fette executed the note and chattel mortgage and sent them on to Theobald and Aureguy without having the chattel mortgage acknowledged or recorded. In the subsequent bankruptcy of Higgins and Fette, the plaintiffs, because of the invalid chattel mortgage, were relegated to the position of unsecured creditors. The personal property covered by the chattel mortgage was of a value sufficient to fully secure the amount of the loan had the chattel mortgage been valid." Theobald v. Byers, *supra*, 13 Cal.Rptr. 864, 865.

It should be noted that the trial court in *Theobald* found the attorneys negligent, but not liable, because of the contributory negligence of the plaintiffs.

The appellate court, in recognizing that the doctrine of contributory negligence is a proper defense in actions against doctors and dentists for medical malpractice, said:

"There would seem to be no reason whatever why the same rule should not be applicable in a legal malpractice action where there is evidence that a client chose to disregard the legal advice of his attorney." Theobald v. Byers, *supra*, 13 Cal.Rptr. 864, 866.

On reversing the trial court's finding of contributory negligence on the part of the plaintiff, the appellate court said:

" . . . The trial court made specific findings as to the acts which constituted contributory negligence on the part of the appellants, namely, failure to inquire of respondents or any other attorney whether the chattel mortgage should be acknowledged and recorded, and failure to themselves acknowledge and record the chattel mortgage. We are of the opinion that these omissions on the part of appellants cannot be said to be sufficient as a matter of law to constitute contributory negligence.

\* \* \* \* \* \*

"Clearly the value of an attorney's services in connection with a transaction of this nature consists largely of his superior knowledge of the necessary legal formalities which must be fulfilled in order for a document to be valid in the eyes of the law. If laymen such as appellants were already familiar with the requirements to be met in order to attain the legal status of secured creditors, it would seem likely that there would be a considerable decrease in the demand for attorneys' services. Appellants employed respondents to perform a specific legal service for them. Respondents negligently failed to do so. Under these circumstances the trial court erred in finding appellants guilty of contributory negligence merely because they failed to record the chattel mortgage themselves or hire another attorney to do so." Theobald v. Byers, *supra*, 13 Cal.Rptr. 864, 866.

■ Applying the reasoning of the court in *Theobald* to the instant case, it would be unreasonable to expect the Feils to know the consequences of their failure to return to the lawyer's office so that proper attachments could be made to the agreement and so that the Bulk Sales Law could be complied with, especially when they had been given an executed copy of the agreement, when they had not been advised by their lawyer that the agreement with the proper attachments should be filed in the register of deeds' office of that county, or of the consequences of not filing same.

Accordingly, we must conclude that Mr. Wishek's failure to advise his clients of the consequences of not filing the agreement with the appropriate office constituted negligence in this case which proximately caused their loss, and that the conduct of the clients was not such as to amount to contributory negligence.

Having decided as we have on the merits of the malpractice issue, we conclude that Mr. Wishek is not entitled to any attorney fees and costs for his appearance before the referee in bankruptcy, as any efforts made on behalf of the Feils served to benefit him.

Commenting briefly on the dissent filed in this case, we note that the authority cited for the position taken in the dissent is encyclopedia law.

The text writers of 7 Am.Jur.2d Attorneys at Law § 175 refer to the case of Fenaille v. Coudert, 44 N.J.L. 286 (1882), in support of their position that the mere fact "that an attorney is employed to prepare papers that are required to be recorded does not make it, without more, the attorney's duty to have them recorded."

It should be noted that our position in the instant case is not that it was the responsibility of the attorney to file the sales agreement, but that it was his responsibility to advise his client of the need for filing that instrument and the reasons supporting such a need.

In Syllabus 2 of *Fenaille* it is stated:

"2. An attorney-at-law who accepts an employment to draw such a contract does not thereby impliedly undertake to file it. In the absence of an express undertaking to file it, he will not be liable for failure so to do. *Quaere, whether, when so employed, he would be liable for failing to advise his client of the risk of not filing such a contract.*" [Emphasis added.]

Fenaille v. Coudert, 44 N.J.L. 286 (1882).

The court in *Fenaille* did not answer the question stated in Syllabus 2.

It should be further noted that the attorneys who drew the contract in *Fenaille* were attorneys of the state of New York and the contract was for building on lands in the state of New Jersey.

Pertinent is Syllabus 1 of *Fenaille*:

"1. An attorney-at-law of the State of New York, employed there to draw a contract for building on lands in New Jersey, does not, by accepting such employment, impliedly undertake that he is acquainted with the laws of this state respecting the necessity of filing of such contracts for protection against claims of workmen and material-men under the mechanics' lien law."

*Fenaille* is also the authority relied on by the text writers to support the statement contained in 7 C.J.S. Attorney and Client § 145.

For the reasons stated herein, the judgment of the trial court is affirmed.

STRUTZ, C. J., and PAULSON and TEIGEN, JJ., concur.

KNUDSON, Judge (Dissenting).

I do not agree with the majority opinion holding Mr. Wishek negligent for failure to advise Mr. Feil to file the agreement between Mr. Feil and Mr. Mayer, and I therefore dissent.

The sole issue in this case is whether or not Mr. Wishek was negligent in failing to advise Mr. Feil that it was necessary to file the agreement in the proper office to secure his right in the property sold as vendor. In this case Mr. Wishek was employed to reduce to writing an agreement between Mr. Feil and Mr. Mayer for the sale and purchase of the grocery business of Mr. Feil, including the furniture and fixtures and the stock of merchandise on hand. Mr. Wishek prepared an agreement accordingly, except for the description of the furniture and fixtures included in the sale, which in the agreement was designated "as set out in the attached list." Mr. Feil and Mr. Mayer were to bring back to Mr. Wishek a list of the furniture and fixtures to be appended to the agreement as an addendum

thereto. An up-to-date list of such furniture and fixtures was not brought to Mr. Wishek, although an incomplete list thereof was left at his office some six weeks or two months later. Such list was never attached to the several copies of the agreement. The agreement as drawn by Mr. Wishek was signed by the parties and a copy thereof delivered to each party on the day of the date thereof.

At the time Mr. Wishek was employed to draw the agreement the matter of the filing of the agreement in the appropriate office was not mentioned by any of the parties or by Mr. Wishek. The agreement was not at that time filed in the Register of Deeds office for McIntosh County.

I do not think that any duty was imposed on Mr. Wishek to file this agreement arising out of his employment as an attorney at law, or implied from his employment to draw the agreement in this case. There is no evidence in the record that he was instructed or requested to file the agreement, nor that Mr. Feil or Mr. Mayer desired that the agreement be filed. In fact, there was no discussion relating to the filing of the agreement.

In this case all that Mr. Wishek was employed to do was to draw the agreement from the information given to him by Mr. Feil and Mr. Mayer. Under the circumstances, all that Mr. Wishek undertook to do was to prepare and draw a sufficient contract for the sale and purchase of the grocery business from Mr. Feil by Mr. Mayer. Apparently the agreement was sufficient for that purpose, as Mr. Mayer assumed the ownership of the business, went into possession, operated the business for several years, and made the payments to Mr. Feil periodically as called for in the agreement, before his insolvency precipitated the present controversy.

It appears that when an attorney has been employed to draw an agreement, and the duty extends no further than the drawing of the agreement, and there has been

**228**

no express agreement or contract to file the instrument or agreement, then the attorney is not liable for the failure to file the contract, nor is there under such circumstances of employment a part of the attorney's duty to advise the parties to the agreement of any requirement to file such agreement in the proper office.

In 7 Am.Jur.2d Attorneys at Law § 175 it is said that:

> Where an attorney agrees to have certain documents recorded and neglects to do so, he is responsible for any damages resulting from his negligence. But the mere fact that an attorney is employed to prepare papers that are required to be recorded does not make it, without more, the attorney's duty to have them recorded. There must be a special undertaking for this purpose, or the original employment must be broad enough to include it.

And in 7 C.J.S. Attorney and Client § 145, it is written that:

> *Recording.* An attorney employed to prepare deeds, contracts, or other papers which are required to be registered in order to be effective as to third parties is not bound, in the absence of a special contract, to file such papers for recordation, or to see that they are recorded; that is no part of his duty as attorney unless he has especially undertaken it. He may be liable, however, in cases where he has expressly contracted to attend to their being recorded, or where the special circumstances are such as to raise the implication of such a contract.

In this case there was no express contract between Mr. Wishek and Mr. Feil that the agreement be filed. Consequently, there is no duty on the part of Mr. Wishek to see to the filing of this agreement, or to advise Mr. Feil as to any requirement that it be filed.

I would reverse the judgment of the trial court.